NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 6, 2023

S23A0746.  GREEN v. THE STATE.

MCMILLIAN, Justice.

Appellant Tarus Malike Green was convicted of felony murder in connection with the shooting death of Gregory Bivin.[1] On appeal, Green argues that (1) the evidence was constitutionally insufficient

---

[1] Bivin was killed on September 26, 2012, and on August 19, 2015, a Chatham County grand jury indicted Green for malice murder (Count 1), felony murder predicated on aggravated assault with a deadly weapon (Count 2), felony murder predicated on aggravated assault with intent to rob (Count 3), felony murder predicated on armed robbery (Count 4), violations of the Street Gang and Terrorism Prevention Act (Counts 5 and 8), possession of a firearm during commission of a felony (Count 6), armed robbery (Count 7), and possession of a firearm by a convicted felon (Count 9). Prior to trial, the gang act charges (Counts 5 and 8) were nolle prossed. At a bifurcated trial held from May 21 to 24, 2019, a jury found Green guilty of two counts of felony murder (Counts 3 and 4) and armed robbery (Count 7). Green was acquitted of the remaining counts. The trial court sentenced Green to serve life in prison with the possibility of parole for felony murder predicated on armed robbery (Count 4). The other convictions were merged or vacated by operation of law.

Green filed a timely motion for new trial on June 10, 2019, which was amended by new counsel on January 13, 2020. Following a hearing on January 29, 2020, the trial court denied Green's motion for new trial on February 14, 2023. Green filed a timely notice of appeal, and the case was docketed to the April 2023 term of this Court and submitted for a decision on the briefs.

to sustain his conviction; (2) the trial court erred by allowing the jury during deliberations to review cell phone records that were admitted as evidence but were neither published nor explained to the jury during the trial; and (3) the trial court erred in allowing admission of a witness's alleged prior inconsistent statement without first affording the witness the opportunity to explain or deny the substance of the statement pursuant to OCGA § 24-6-613 (b). As explained below, each of these claims fails, so we affirm.

The evidence presented at trial showed the following. Bivin and his brother Justin Bivin ("Justin") often sold guns together. On September 26, 2012, Bivin was at his aunt's home where he lived and, according to her testimony, Bivin told her that he was going to meet up with someone to sell a gun to him. Justin testified that Bivin was going to meet up with Basheen "Baba" Hills, whom Justin was able to identify in a photographic lineup, and Hills's friend to sell a gun.

Bivin and Justin had a practice of texting each other updates during a sale when one of them went without the other. On

2

September 26, 2012, Bivin texted Justin a message that read, "PDE6814, green Camry license, meeting him now," which Justin understood to be the license plate of the vehicle arriving for the gun sale. Justin texted back to check in several times but never heard back from Bivin.

Police arrived on the scene in response to a "check person" call and discovered Bivin's body in the driver's seat of his car with multiple gunshot wounds. There was a .45-caliber gun under the driver's seat. Police also found three 9mm shell casings and two bullets at the scene. The autopsy showed 12 gunshot wounds, and the medical examiner determined the cause of death to be homicide by multiple gunshots.

Police obtained a search warrant for the green Toyota Camry referenced in the text message, which led them to search a residential area where they located the car parked behind a house. While searching the area, officer also saw Hills sitting on a nearby porch shortly before they located the Camry. Officers discovered during their investigation that the car belonged to Green, and Green

3

admitted ownership, even though the car was registered in someone else's name. Green told investigators that Hills had borrowed his Camry to "make a play," which Green said he understood to mean Hills was going to make a drug deal. According to Green, Hills told him that he entered Bivin's vehicle from the passenger side and intended to rob Bivin but ended up shooting him. Hills's fingerprints were found on the right handle of Bivin's vehicle and on Green's Camry. According to Sabrina Harris, who knew Green, Hills had borrowed Green's Camry at some point around the time of the shooting.[2]

Green also told officers that Hills took from Bivin's car a green rifle, which was the gun Bivin planned to sell. Green claimed that he later bought the gun from Garnell Quarterman, Hills's brother, and then resold it. Quarterman testified that he did not sell this gun to Green. The gun was never found.

---

[2] The State indicted Hills on four counts of murder and armed robbery, but then agreed to nolle pros the murder counts and reduce the armed robbery to robbery in exchange for his agreement to testify against Green. Hills was sentenced to fifteen years, with five to serve in prison. However, Hills did not testify at Green's trial.

During the course of their investigation, officers interviewed Corey Milton, who said that he knew Green had a green Camry, that Green told him that "a cracker bucked, I shot him," and that it was not "Baba" (Hills's nickname) who shot someone. The State played this recorded interview for the jury at trial. However, before the interview was played, Milton testified that he did not remember an interview or Green telling him about a murder, stating "I be getting high. I don't know." After a break, Milton testified that he did remember telling law enforcement "lies to try to get out of trouble" and that he would "say anything." Milton further testified that the investigators brought up his criminal record, including a federal conviction and state charges that were dismissed, and that during the conversation about Green, Milton was "looking for help" with his case.

In his defense, Green presented the testimony of Lieutenant Andre Jackson, who was qualified as an expert in cell tower mapping. He testified that cell phone records placed Hills in the area of the homicide and that Hills's phone "hit off" the same cell tower

as Bivin's phone minutes before the shooting. Cell phone mapping did not show Green's cell phone in that location. One data point showed Green's phone at home shortly after the shooting, but there was also an hour or so, which included the time of the shooting, where there was no cell phone data from Green's device. During the course of this testimony, Green's counsel moved the cell phone records into evidence, and they were admitted over the State's objection.

1. Green asserts that the evidence was insufficient as a matter of constitutional due process to sustain his conviction for felony murder predicated on armed robbery. In reviewing sufficiency, this Court determines whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis in original). "In doing so, we construe the evidence presented in the light most favorable to the verdict, and neither reweigh it nor determine witness credibility." *Simmons v.*

*State*, 314 Ga. 883, 887 (1) (880 SE2d 125) (2022) (citation and punctuation omitted).

"A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon[.]" OCGA § 16-8-41 (a). "A person commits the offense of murder, when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c). "Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a).

Here, the evidence presented at trial showed that the car that approached Bivin for the gun sale belonged to Green, and Justin testified that Bivin was going to meet two men: Hills and Hills's friend. Hills's fingerprint was on Bivin's car, and his cell phone showed that he was near the shooting around the time it happened. Additionally, Green said he purchased the gun Bivin intended to sell, but the person Green said sold the gun to him denied doing so.

7

Moreover, despite Milton's inconsistent testimony at trial, Milton stated in his recorded interview, which was shown to the jury, that Green confessed to shooting someone and that Hills did not do it. This evidence was sufficient as a matter of constitutional due process for a rational jury to find Green guilty beyond a reasonable doubt for felony murder predicated on armed robbery. See *Waller v. State*, 311 Ga. 517, 522 (2) (a) (858 SE2d 683) (2021) (evidence was sufficient to find appellant guilty of felony murder based on armed robbery when, among other things, appellant told a cell mate that he "robbed a dude and killed the dude for $40,000").

2. Green also asserts that the trial court erred by allowing the jury during deliberations to review cell phone records that had been admitted as evidence but had not been published or explained to the jury during the trial.

Even though the cell phone records were never published or explained in detail to the jury, the CDs containing the records were moved into evidence by Green and admitted, and the records were generally referred to in Lieutenant Jackson's testimony. Green does

8

not argue that the cell phone records were not otherwise properly admitted into evidence.

Properly admitted original documentary evidence, such as the cell phone records admitted in this case, is "properly allowed to go out with the jury" during deliberations. See *Lofton v. State*, 310 Ga. 770, 786 (4) (854 SE2d 690) (2021) (holding that phone records admitted into evidence were original documentary evidence that were properly allowed to go out with jury). See also *United States v. Loughry*, 738 F3d 166, 170 (II) (7th Cir. 2013) (citing multiple federal circuits for the proposition that "jurors are generally entitled to examine exhibits that are properly admitted into evidence"). Green does not cite any authority that evidence has to be published to the jury during trial in order for the jury to review properly admitted evidence during deliberations, nor have we found any.[3] Therefore, this enumeration fails.

---

[3] Nor does Green cite any authority to support his argument that it was improper to print the cell phone records from the CDs that were admitted as evidence and for the trial court to allow the jury to review the records in paper form, rather than digitally using a device such as a computer to read the CDs' contents.

3. Finally, Green asserts that the trial court erred in allowing admission of Milton's prior inconsistent statement because the State allegedly did not first afford Milton the opportunity to explain or deny the substance of the statement pursuant to OCGA § 24-6-613 (b).[4] We review a trial court's evidentiary ruling for abuse of discretion. See *Bridgewater v. State*, 309 Ga. 882, 886 (2) (848 SE2d 865) (2020).

When first asked by the State about his interview with law enforcement, Milton said first that he did not remember making a previous statement to law enforcement; then, he claimed that he did remember talking to law enforcement but that he lied to try to get out of trouble; and he testified that he did not remember Green ever telling him about being involved in a murder. Green's counsel then cross-examined Milton. Following testimony by another witness the

---

[4] OCGA § 24-6-613 (b) provides that, absent exceptions not relevant here,

extrinsic evidence of a prior inconsistent statement by a witness shall not be admissible unless the witness is first afforded an opportunity to explain or deny the prior inconsistent statement and the opposite party is afforded an opportunity to interrogate the witness on the prior inconsistent statement or the interests of justice otherwise require.

next morning, Milton's recorded interview was admitted into evidence and played for the jury.

"A witness's failure to remember making a statement may provide the foundation for offering extrinsic evidence to prove that the statement was made." *London v. State*, 308 Ga. 63, 66-67 (3) (a) (838 SE2d 768) (2020) (citation and punctuation omitted); *Bridgewater*, 309 Ga. at 887 (2) (a defendant's denied recollection of making a statement provided sufficient foundation for the State to present extrinsic evidence of the statement). Here, the State laid the foundation for the admission of the recorded interview when it asked Milton twice if he recalled making the statements, and Milton responded first that he could not recall making the statements, and then that he did recall but had lied.

Because there was sufficient foundation laid under OCGA § 24-6-613 (b), the trial court did not abuse its discretion in admitting Milton's recorded interview as a prior inconsistent statement. See *Neloms v. State*, 313 Ga. 781, 787 (4) (a) (873 SE2d 125) (2022) (citing OCGA § 24-8-801 (d) (1) (A) for the proposition that prior

11

inconsistent statements that meet the requirements of OCGA § 24-6-613 (b) are not hearsay and are admissible if the declarant testifies at trial and is subject to cross-examination). Therefore, this enumeration fails.

*Judgment affirmed. All the Justices concur.*